**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOHN H. QUILLIN, *et al.*     **:**

           **:**

  v.         **:**

           **:**  Civil Action No. CCB-07-00503

C.B. FLEET HOLDING    **:**

COMPANY, INC., *et al.*    **:**

        ...o0o...

**MEMORANDUM**

Now pending before the court is a motion for summary judgment filed by defendants

C.B. Fleet Holding Company, Inc. ("Fleet"), Wal-Mart Stores, Inc., Wal-Mart Stores East, Inc.,

and Wal-Mart Stores East, LP (collectively "Wal-Mart") against plaintiffs John H. and Evelyn

M. Quillin.  The plaintiffs assert numerous tort and contract theories against the defendants for

the manufacture and sale of the allegedly defective Fleet Phospho-soda laxative product.  In

response, the defendants filed this motion for summary judgment on the grounds that the

plaintiffs are time-barred for having failed to file suit within the three-year limitations period

established by § 5-101 of the Courts and Judicial Proceedings Article of the Annotated Code of

Maryland.  The issues in this case have been fully briefed.  For the reasons stated below, the

defendants' motion will be granted.

**BACKGROUND**

This medical products liability case centers around an allegedly defective over-the-

counter bowel cleansing product known as Fleet Phospho-soda that is commonly used in

preparation for colonoscopy procedures.  (*See* Def.'s Mem. at 1.)  The plaintiffs' Complaint

provides that plaintiff John H. Quillin ("Quillin") was scheduled for a routine colonoscopy on

February 25, 2003, and was instructed by his doctor to "prep" for the procedure by utilizing the

Fleet Phospho-soda product.  (Pl.'s Am. Compl. at ¶ 14.)  Quillin purchased two 1.5 fl. oz. packages of Fleet Phospho-soda from Wal-mart Store # 2560, and on February 24, 2003, he used the product in accordance with its instructions.  (*Id.* at ¶ 15.)  Shortly after the completion of his colonoscopy on February 25, 2003, Quillin "began to experience violent illness, including nausea and vomiting, bloating and uncontrollable hiccups for several days."  (*Id.* at ¶¶ 18-19.) Pursuant to the advice of his doctor, Quillin was admitted to Peninsula Regional Hospital on February 27, 2003, "where he was diagnosed with acute renal [kidney] failure and remained for approximately two weeks."  (*Id.* at ¶ 20.)  On March 11, 2003, a renal biopsy revealed that Quillin had suffered interstitial fibrosis and tubular injury.  (*Id.* at ¶ 21.)

According to Quillin, the specific results of his biopsy test were never disclosed to him, and he "was never informed by any medical professionals or anyone else, of any potential cause of [his] renal failure at any time during [his] hospitalization or subsequent treatment."  (Pl.'s Opp Mem. at Ex. A, Quillin Aff. at ¶ 6.)  Since 2003, Quillin has continued to suffer from chronic kidney failure, which has interfered with the treatment of his ongoing cardiac condition.  In June 2006, Quillin had a renal stent implanted in his left kidney due a to renal artery blockage and may soon have to begin dialysis treatment.  (Pl.'s Am. Compl. at ¶¶ 25, 29.)  Quillin asserts that it was not until June or July of 2006, when he learned for "the first time . . . of any possible connection between [Fleet Phospho-soda] and [his] kidney illness" after reading a newspaper advertisement.  (Pl.'s Opp. Mem. at Ex. A, Quillin Aff. at ¶ 7.)  On January 17, 2007, the plaintiffs filed their Complaint against the defendants asserting the following causes of action: (1) Strict Liability - Design Defect/Failure to Warn; (2) Negligence - Failure to Warn; (3) Negligent Misrepresentation; (4) Negligence - Design Defect; (5) Deceptive Acts or Practices;

(6) False Advertising; (7) Breach of Express Warranties; (8) Breach of Implied Warranties; (9) Fraud and Deceit; and (10) Loss of Consortium.  (Pl.'s Opp. Mem. at 2.)

For the purposes of this summary judgment motion, the defendants accept the facts set forth in the plaintiffs' Complaint concerning Quillin's product usage and kidney failure as true, (Def.'s Mem. at 2,) and instead argue that as of February 27, 2003, the plaintiffs knew or should have known that the Fleet Phospho-soda product Quillin "used in preparation for his colonoscopy on February 25, 2003 was a possible source of his acute renal failure diagnosed on February 27, 2003" (Def.'s Reply Mem. at 1-2).  More specifically, the defendants argue that "based on the facts as alleged by the Plaintiffs in their complaint and Quillin Affidavit, as well as various medical records, the Fleet Phospho-soda label, and readily accessible literature," the plaintiffs had actual implied notice on February 27, if not actual express notice, that the Fleet Phospho-soda product may have been linked to Quillin's kidney failure.  (Def.'s Reply Mem. at 3.)  According to the defendants, "a reasonably diligent investigation [in February 2003] would have revealed readily accessible information linking the use of oral sodium phosphate bowel cleaning products with renal failure."  (*Id.* at 2.)  Therefore, the defendants argue, because the current lawsuit was filed more than three years since the cause of action accrued on February 27, 2003, the plaintiffs are time-barred by the § 5-101 Maryland statute of limitations.

This opinion focuses on limitations issues related to determining the proper accrual date of the plaintiffs' cause of action.

**ANALYSIS**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

<u>Section 5-101 Statute of Limitations</u>

4

Under Maryland law, "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." Md. Code Ann., Cts. & Jud. Proc. § 5-101 (1998). Maryland has also adopted the "discovery rule" for all civil actions in place of the historical rule that deemed an action to accrue "on the date of the wrong." *Pennwalt Corp. v. Nasios*, 550 A.2d 1155, 1158 (Md. 1988) (citing *Hahn v. Claybrook*, 100 A. 83 (Md. 1917)). Under the discovery rule, "the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong." *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981). Thus, the discovery rule requires that the plaintiff have notice of a claim to start the running of the statute of limitations. The Maryland Court of Appeals has defined such notice as "express cognition, or awareness implied from knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Poffenberger*, 431 A.2d at 677. In other words, to satisfy the "should have known" prong of the discovery rule, a claimant must be found to possess "implied actual knowledge," which is "that knowledge that would in all probability have resulted from a reasonably diligent investigation pursued upon awareness of circumstances that would cause a reasonable person to investigate." *Pennwalt*, 550 A.2d at 1160. Therefore, in order to prove that a claimant was on inquiry notice in a products liability case, a defendant must prove that: "(1) the plaintiff[] knew of facts sufficient to cause a reasonable person to investigate further, and (2) a diligent investigation would have revealed that the plaintiff[]" suffered injury, that the injury was probably caused by the defendant, and that there was likely manufacturer wrongdoing or product defect. *Id*. at 1163-

5

64, 1165; *see also Hartnett v. Schering Corp.*, 806 F. Supp. 1231, 1234 (D. Md. 1992), *aff'd*, 2 F.3d 90 (4th Cir. 1993).

The above construction of the Maryland statute of limitations satisfies the stated policy rationale of the discovery rule.  The Maryland Court of Appeals has noted that the discovery rule "gives to the individual exercising reasonable diligence the full benefit of the statutory period in which to file suit, while at the same time protecting the defendant from 'stale claims'" by those who have slumbered on their rights.  *Pennwalt*, 550 A.2d at 1159 (quoting *Harig v. Johns-Manville Prods. Corp.*, 394 A.2d 299, 304 (1978)).  Therefore, the key issue in this case, as in other similar inquiry notice cases, is whether the plaintiffs in early 2003 had knowledge of facts that would have led a reasonable person to investigate further the possible connection between the Fleet Phospho-soda product and Quillin's kidney failure.  *See id.* at 1160.  If no reasonable juror could rationally conclude, in the face of the information Quillin had on February 27, 2003, with respect to his kidney failure, that a reasonable person would not have investigated the possibility that the Fleet product was the source of his illness, then summary judgment is appropriate.  *See Doe v. American Nat'l Red Cross*, 923 F. Supp. 753, 759 (D. Md. 1998) (concluding that summary judgment was appropriate when the victim of an HIV positive blood transfusion failed to investigate a possible cause of action against the blood bank within the three-year limitations period).

*Accrual Date of the Plaintiffs' Claim*

Viewing the evidence in the light most favorable to the non-movant plaintiffs, the court must now determine whether the plaintiffs knew or should have known of their potential cause of action on February 27, 2003.  Although the plaintiffs may not have had express actual

knowledge that Quillin's kidney failure was related to the Fleet Phospho-soda product, the record demonstrates that a reasonable person would have further investigated the cause of this serious and unexpected illness that occurred so soon after the colonoscopy. Additionally, the record reveals that even a minimal investigation would have provided sufficient information concerning injury, probable cause, and manufacturer wrongdoing or product defect to support a cause of action. Therefore, because the plaintiffs should have known of the alleged wrong, at the latest, by the time of Quillin's renal biopsy on March 11, 2003, the January 17, 2007 claim is barred pursuant to § 5-101 of the Maryland Code.

In order to determine whether the plaintiffs should have known of their cause of action on February 27, 2003, the court must first consider whether the plaintiffs on that date "knew of facts sufficient to cause a reasonable person to investigate further" the cause of injury. *Pennwalt*, 550 A.2d at 1163-64. The record in this case undisputedly reveals that Quillin used the Phospho-soda product on February 24, underwent a routine colonoscopy on February 25, soon thereafter "began to feel ill," and subsequently was admitted to Peninsula Regional Medical Center on February 27 for acute renal failure. The record further reveals that during his February 27 medical examination at the Medical Center, Quillin explained to Dr. Eng that "[h]e apparently had taken a significant amount of laxatives prior to his colonoscopy, which he thinks may have dried him out." (Def.'s Mem. at Ex. 6.) Furthermore, the Fleet Phospho-soda product contained a warning concerning possible dehydration, the product's significant risk to those with kidney disease, and the need to contact a doctor in the event of adverse symptoms. (Def.'s Reply Mem. at Ex. 3.) Although Quillin was soon diagnosed by doctors with "[a]cute renal failure probably related to dehydration with an insult by taking ACE inhibitor, NSAID, hydrochlorothiazide, and

7

[] aspirin," the plaintiffs maintain that Quillin "was never informed by any medical professionals or anyone else, of any potential cause of [his] renal failure at any time during [his] hospitalization or subsequent treatment." (Pl.'s Opp. Mem. at Ex. A, Quillin Aff. at ¶ 6.) The record is devoid of evidence that Quillin ever questioned his doctors about the possible cause of his kidney failure, or that he ever independently investigated the cause of his illness. Given the gravity of kidney failure as a medical condition, the proximity in time of Quillin's illness to his colonoscopy and Phospho-soda ingestion, and Quillin's apparent knowledge and disclosure that Fleet Phospho-soda may have caused dehydration, it is simply unreasonable to conclude that a person of ordinary prudence would not have pursued, at the least, a minimal investigation into the cause of illness under the circumstances. Therefore, because a person of ordinary prudence would have investigated the cause of kidney failure in Quillin's case, the plaintiffs are deemed to have been on inquiry notice at the latest by March 11, 2003, the date of Quillin's renal biopsy.

Finding that Quillin was on inquiry notice by March 11, 2003, is consistent with case law that has interpreted the Maryland statute of limitations in similar circumstances. For example, in *Lutheran Hospital v. Levy*, 482 A.2d 23, 25 (Md. Ct. Spec. App. 1984), the plaintiff, Ms. Levy, was put into a cast at Lutheran Hospital to treat a broken ankle on October 25, 1973, and then told that she could walk on the cast without crutches. Nearly six months later, in April 1974, still suffering from ankle problems, Ms. Levy sought the advice of Dr. Wiedmann, who told her that "her ankle 'was all messed up,' [and] asked 'who the hell told you to walk on that ankle?'" *Id.* Although Ms. Levy acknowledged that this visit revealed to her that there was a problem with her ankle, she "did not begin to explore the possibility of legal redress." *Id.* at 26. It was not until June 15, 1978, following two more surgeries on her ankle that had been improperly

casted at Lutheran, that Ms. Levy finally filed suit against the hospital after receiving another

medical opinion concluding she had suffered from malpractice.  *Id.*[1]  The court determined that

"[t]he evidence bearing on the examination [by Dr. Wiedmann] permits no conclusion other than

that Ms. Levy became aware that she might have been wronged when she consulted Dr.

Wiedmann in April of 1974."  *Id.* at 27.  The court added that the visit "did not occur in a

vacuum . . . [and that] a reasonable fact finder could only conclude that in April 1974 Ms. Levy

had 'knowledge of circumstances which ought to have put [her] on inquiry (thus charging her)

with notice of all facts which such an investigation would have disclosed if it had been properly

pursued.'"  *Id.* (quoting *Poffenberger*, 431 A.2d at 677).  In concluding that Ms. Levy's claim

was barred by § 5-101, the court stated that "the limitations begin to run when a claimant gains

knowledge sufficient to put her on inquiry.  As of that date, she is charged with knowledge of

facts that would have been disclosed by a reasonably diligent investigation."  *Id.*; *see also*

*Hartnett*, 2 F.3d at 93 (finding that when the plaintiff was informed in March 1981 "that she

suffered from various 'stigmas' of *in utero* exposure to DES," including possible infertility, such

facts were "sufficient, as a matter of law, to cause a reasonable person to investigate further");

*Doe*, 923 F. Supp. at 759 (finding that "no reasonable juror could rationally conclude, in the face

of the

---

[1]  Interestingly, despite Ms. Levy's initial suspicions based on Dr. Wiedmann's
assessment, the malpractice that Ms. Levy actually suffered on her ankle resulted not from the
advice to walk without crutches, but rather from an improper casting.  *Lutheran Hospital v. Levy*,
482 A.2d 23, 27 (Md. Ct. Spec. App. 1984).  *Levy*, therefore, suggests that it is notice of injury
and potential wrongdoing, not specific causation, that should trigger an investigation into the
actual cause of injury.  Thus, for the purpose of determining whether a claimant was on inquiry
notice, it is not dispositive whether the claimant eventually finds that his suspected cause of
injury was not, in fact, the actual cause of injury.

information" the plaintiff had concerning her acquiring HIV during a medical procedure, "that a reasonable person would not have investigated the possibility that the transfusions were in fact the source of Doe's infection).

Here, Quillin was on notice that he had suffered an injury and possible wrongdoing given the proximity in time of his kidney failure to his Phospho-soda intake and colonoscopy procedure. Given his circumstances, it was unreasonable for Quillin not to have pursued even a minimal investigation into the cause of his kidney failure. Therefore, like Ms. Levy, Quillin may be charged with notice of all facts which such an investigation would have disclosed if it had been properly pursued.

The plaintiffs argue that the circumstances surrounding Quillin's cause of action are closely analogous to two other Maryland cases, where the court both times found that granting summary judgment was improper since determining whether a reasonable person would have investigated the cause of an injury was a question of fact for the jury to decide. *See Baysinger v. Schmid Prods. Co.*, 514 A.2d 1, 4 (Md. 1986); *DeGroft v. Lancaster Silo Co.*, 527 A.2d 1316, 1326 (Md. Ct. Spec. App. 1986). In *Baysinger*, the plaintiff had an intrauterine contraceptive device implanted in May of 1979 until November of that year, when it was removed due to Mrs. Baysinger experiencing lower abdominal pains. *Baysinger*, 514 A.2d at 2. Mrs. Baysinger's symptoms appeared to improve with a prescription of Ampicillin until December 25, 1979, "when she was admitted to a local hospital with severe abdominal pain and high fever." *Id.* Mrs. Baysinger was subsequently diagnosed with acute peritonitis with bilateral tubo-ovarian abscesses and a strong likelihood of infertility. *Id.* During Mrs. Baysinger's hospitalization, she had specifically asked her doctor whether the contraceptive device was to blame for her illness,

to which Dr. Cho "responded that there could be several possible causes but could not state the coil was responsible." *Id.* Furthermore, Mrs. Baysinger's other doctor, Dr. Gallaher, stated in a deposition that at the time of her hospitalization he had no idea what had caused her illness. *Id.* Mrs. Baysinger did not file suit until January 17, 1984, after her sister saw a newspaper advertisement in early 1983, indicating a potential causal link between the contraceptive device and pelvic infection. Reversing the trial court's determination that Mrs. Baysinger's cause of action had accrued as a matter of law in late 1979, the Maryland Court of Appeals found that Mrs. Baysinger had conducted "a preliminary investigation by discussing her suspicions with Dr. Cho [in late 1979], and that Dr. Cho told her he had 'no way of determining whether her infection was caused by the Saf-T-Coil or by some other unrelated occurrence or instrumentality.'" *Id.* at 4. Furthermore, the court noted that Dr. Gallaher "had no idea of what caused her illness, and consequently further investigation by way of inquiry of Dr. Gallaher would have been fruitless." *Id.* Thus, the Court held that "[w]hether a reasonably prudent person would then have undertaken a *further* investigation is a matter about which reasonable minds could differ, and it was therefore inappropriate for resolution by summary judgment." *Id.*

In *DeGroft*, the plaintiff contracted with the defendant contractor to have a silo built on his farm in 1975. 527 A.2d at 1320. By 1977, the plaintiff's neighbors informed him that his silo appeared to be leaning. *Id.* at 1325. The plaintiff contacted the defendant and "received repeated assurances . . . for several years that the silo was sound." *Id.* It was not until 1982, when circumstances required dismantling the silo, that the plaintiff found the "concrete footing was cracked and that the silo had been improperly constructed." *Id.* Rejecting the defendant's argument that the plaintiff had notice of his potential claim as early as 1977, the Court found that

11

"the evidence presented was simply inadequate to indicate that in 1977 [plaintiff] 'then suspected, or reasonably should have suspected wrongdoing on the part of anyone' or to allow us to conclude, as a matter of law, that an ordinary, prudent person would have conducted further investigation." *Id.* at 1326 (quoting *Baysinger*, 514 A.2d at 1).  In finding that the issue of inquiry notice was a question of fact for the jury to decide, the Court emphasized that the defendant's numerous assurances may have been enough to prevent an ordinary and prudent person from undertaking further investigation.  *Id.*

Both the *Baysinger* and *DeGroft* cases are distinguishable from the Quillins' case.  First, in both of those cases the plaintiffs pursued at least a preliminary investigation, and then relied on expert assurances in deciding not to investigate their claims further.  *See Doe*, 923 F. Supp. at 761 (distinguishing *Baysinger* because the plaintiff there "began an investigation, but was told (authoritatively, by medical professionals) that there was no way to determine if any wrong had occurred or what the source of any wrong may have been").  Second, the plaintiffs in both *Baysinger* and *DeGroft* did not suffer injuries in such close time proximity to the defendant's alleged improper conduct that it would immediately indicate wrongdoing.

Here, however, the record indicates that Quillin failed to conduct even a minimal investigation into the cause of his kidney failure.[2]  This lack of due diligence is even more surprising given the close proximity in time of his Phospho-soda intake, colonoscopy procedure,

---

[2]  The plaintiffs maintain both in the Complaint and in Quillin's affidavit that Quillin was never informed about the results of his renal biopsy, and that he was never informed by medical professionals or anyone else of any potential causes of his kidney failure.  (Pl.'s Am. Compl. at ¶¶ 21-22; Pl.'s Opp. Mem. at Ex. A, Quillin Aff. at ¶ 6.)  Furthermore, the plaintiffs provide no evidence that Quillin ever inquired into the cause of his illness.  Thus, although it appears quite remarkable that Quillin never asked and was never informed about any potential causes of his kidney failure, the court must consider the facts as they have been provided by the plaintiffs.

and subsequent renal failure.  No reasonable juror could conclude that a reasonable person would not have investigated the possibility that Quillin's kidney failure was caused by some wrongdoing.  Unlike the plaintiffs in *Baysinger* and *DeGroft*, who both conducted preliminary investigations and then relied on assurances in deciding not to pursue their potential claims further, Quillin, quite simply, did nothing.  As previously noted, the discovery rule "gives to the individual exercising reasonable diligence the full benefit of the statutory period in which to file suit, while at the same time protecting the defendant from 'stale claims'" by those who have slumbered on their rights.  *Pennwalt*, 550 A.2d at 1159 (quoting *Harig*, 394 A.2d at 304).  Because Quillin was on inquiry notice by March 11, 2003, he can be charged with knowledge of any information concerning his potential claim that a reasonable investigation would have uncovered.

Having determined that a person of ordinary prudence would have investigated the cause of injury in Quillin's case, it is now necessary to determine whether a reasonable investigation in March of 2003 would have revealed sufficient information concerning injury, probable cause, and potential manufacturer wrongdoing or product defect to support a cause of action.  *See Hartnett*, 2 F.3d at 93 n.1.  As the Fourth Circuit has noted, "in cases involving medical issues, a reasonably diligent investigation must, at a minimum, include an attempt to obtain and review all available medical records."  *Id.* at 93.  The Court further added that "media coverage, medical literature, and case law" are additional sources of information relevant to a reasonable investigation.  *Id.*

Here, there was sufficient information readily available in early 2003 to support a possible claim.  Quillin's medical records would have confirmed Quillin's apparent suspicions

that the Fleet Phospho-soda had "dried him out."  (Def.'s Mem. at Ex. 6.)  All of Quillin's

medical records related to his February 27 admission to the Peninsula Regional Medical Center

conclude that the likely primary cause of Quillin's renal failure was dehydration, compounded

by various drug interactions.  (*Id.* at Exs. 5, 6, 7.)  One of Quillin's doctors, Dr. Tan, noted in his

medical evaluation that Quillin "developed acute renal failure after volume loss from GI tract.  I

believe he is dehydrated and renal failure is aggravated by other factors, such as ACE inhibitor,

Daypro, and diuretic."  (Pl.'s Opp. Mem. at Ex. D.)  Additionally, medical literature available by

early 2003 had already established a connection between oral sodium phosphate laxatives, like

Fleet Phospho-soda, dehydration, and acute renal failure.  (*See* Def.'s Reply Mem. at Ex. 9.)[3]

Furthermore, the 2003 Physicians' Desk Reference ("PDR") specifically warns not to use Fleet

Phospho-soda if the patient suffers from kidney disease, that the product may cause dehydration,

and that an overdosage may result in renal failure.  (Def.'s Reply Mem. at Ex. 6.)  Therefore,

information that would have been available given a minimal investigation into the cause of

Quillin's kidney failure could have provided sufficient information concerning Quillin's injury,

the probable cause of that injury, and possible manufacturer wrongdoing or product defect to

support a potential cause of action.

      Having determined that Quillin was on inquiry notice by March 11, 2003, at the latest,

---

[3] Some of the journal articles and government publications available before 2003 that link oral sodium phosphate, and sometimes Fleet Phospho-soda by name, to potential kidney problems include: Ahmed M, Raval P, Buganza G: Oral Sodium Phosphate Catharsis and Acute Renal Failure. Am J Gastroenterol 91:1261-1262, **1996**; DiPalma JA, Buckley SE, Warner BA, Culpepper RM: Biochemical Effects of Oral Sodium Phosphate. Dig Dis Sci 41:749-753, **1996**; and Adverse Drug Reactions Advisory Committee (ADRAC): Electrolyte Disturbances with Oral Phosphate Bowel Preparations.  Australian Adverse Drug Reactions Bulletin 16(1), **1997**. (*See* Def.'s Reply Mem. at Ex. 9.)

and that a minimal investigation would have revealed information sufficient to support a cause of

action, the accrual date of the plaintiffs' claim is deemed to be March 11, 2003.  Therefore,

because the current lawsuit was filed more than three years after the date on which the claim

accrued, it is barred by the § 5-101 Maryland statute of limitations and summary judgment must

be granted.


A separate order follows.


    October 11, 2007                                      /s/              
Date                                                  Catherine C. Blake
                                                  United States District Judge